535 So.2d 757 (1988)
STATE of Louisiana, Appellee,
v.
Jeffery Dale NEAL, Appellant.
No. 19622-KA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
*758 Larry D. Jefferson, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, James A. Norris, Jr., Dist. Atty., John P. Spires, Asst. Dist. Atty., Monroe, for appellee.
Before HALL, SEXTON and LINDSAY, JJ.
*759 LINDSAY, Judge.
The defendant, Jeffery Dale Neal, appeals his conviction for sexual battery, a violation of LSA-R.S. 14:43.1. Although originally charged with aggravated rape in violation of LSA-R.S. 14:42, a jury found him guilty of the lesser included offense of sexual battery. He was sentenced to serve ten years at hard labor. For the following reasons, we affirm the defendant's conviction and sentence.

FACTS
The twenty-seven-year-old victim, a divorced mother of three, moved to Bastrop, Louisiana, on or about October 20, 1986. Previously, she and her children had lived in a remote wooded area near Hamburg, Arkansas, for several months. The victim, who suffers from multiple sclerosis, had been recuperating from injuries sustained in a three-wheeler wreck.
On the evening of October 24, 1986, the victim and a male friend decided to go to the Sportsman Lounge. Her sister agreed to keep the children that evening. After leaving the children at her sister's house, the victim and her friend had a disagreement in his vehicle about whether to go out. The victim got out of the friend's car and threatened to walk to the Sportsman Lounge alone at night, hoping to bluff him into accompanying her. Instead, he drove away.
The victim walked on alone through an unfamiliar residential neighborhood toward the lounge. She testified that she was walking along Charlene Street when she heard running footsteps behind her. When she turned to look, the defendant grabbed her and whirled her around. She felt what she thought was a scratch from the defendant's fingernails along her side. The defendant asked her if she had been cut by the knife he was wielding, which she described as being a pocket knife with a hook. (Subsequently, the victim discovered that she had, in fact, been nicked by the weapon.)
The defendant, who is black, threatened to kill the victim if she screamed, and told her it had been a long time since he had "had a white girl." He forced her to walk down the street and behind an abandoned house. The victim testified that the defendant forced her to disrobe, and to engage in both oral sex and vaginal sex. After the rape, the victim and the defendant engaged in conversation. The victim testified that she was trying to stall for time in order to escape. The defendant told her that, in addition to the knife, he also had a gun. He threatened to shoot her and said it would not be the first time he had shot someone. The defendant then asked her how she would like to make some money prostituting herself for him. When the defendant allowed the victim to get dressed, he refused to permit her to put on her underclothing.
The defendant and the victim walked to Dodson Park. While walking toward the park, the defendant menacingly patted his coat pocket which contained his knife and which the victim believed contained a gun. He again warned her that he would kill her if she attempted to flee. At the park, the defendant again forced the victim to engage in sexual intercourse and oral sex.
The defendant told the victim that they were going to a bar where she was going to prostitute herself in order to earn money for him. The victim said that they encountered four people on their way to the bar. However, they seemed to be friends of the defendant, who continued to threaten to shoot her if she attempted to escape. The defendant instructed her to walk ahead of him.
When they reached Gilmore's Lounge, the victim went in alone, while the defendant remained outside. The victim appealed to Frankie Gilmore, one of the owners of the lounge, for help. She told Mrs. Gilmore that there was an armed man outside who had threatened her. According to a statement given by Mrs. Gilmore shortly after the incident, the victim was nervous and shaking when she entered the bar. The police were promptly summoned. Before their arrival, the defendant entered the bar. The crying victim told Mrs. Gilmore the defendant was the man she *760 meant. Mrs. Gilmore told the defendant to go back outside.
When the police arrived, Officer Bobby Barnes saw the defendant begin to walk away from the scene. The officer called him back. The defendant consented to a search, and the officer recovered the knife from his jacket pocket. Sergeant Fred Laing took the distraught victim outside the lounge to get away from the noise within. Sergeant Laing testified that when the victim saw the defendant, she became even more upset. The defendant attempted to walk toward the victim, but Officer Barnes instructed him to stay where he was.
The victim was taken to the police station where she told the officers about the rape. The police then took her back to the neighborhood she described. They located the vacant house on Charlene Street. There, the police found the victim's discarded panties and bra. Thereafter, the victim was taken to Morehouse General Hospital, where she was examined. Ms. Sue Nuckolls, the registered nurse who attended the victim in the emergency room, testified that the victim was crying uncontrollably with periods of calm, and her clothing was in disarray. The nurse testified that a scratch discovered on the victim's side was compatible with a knife wound.
Linda Armstrong, a criminalist with the North Louisiana Crime Lab, testified that the vaginal washings and smears taken from the victim indicated the presence of seminal acid phosphate and spermatozoa. Spermatozoa was also found on the victim's blue jeans and on the defendant's trousers. The test results on the oral swabs, which were taken because of the victim's complaint of oral sexual battery, were negative. However, Ms. Armstrong testified that it was not uncommon for such results to be negative even if oral sex had taken place.
The defendant's account of the events of that night differed substantially from that of the victim. He testified that as he was walking along the street, he saw the victim standing on the corner across the street. She called to him and asked for a match. After he joined her, the victim asked him if he knew how she could get to West Madison without encountering the police. She indicated that she wanted to prostitute herself in order to secure funds to leave town. The defendant claimed that the victim offered to "make it worth his while" if he would show her a safe route. He testified that she took him behind a vacant house on Charlene Street where they engaged in consentual sexual intercourse. They again engaged in sexual intercourse at Dodson Park. The defendant denied mentioning prostitution to the victim. He also claimed that she asked him where she could obtain some marijuana.
The defendant was charged with aggravated rape in violation LSA-R.S. 14:42. After a jury trial, the defendant was convicted of sexual battery in violation of LSA-R.S. 14:43.1. He was sentenced to serve ten years at hard labor.
The defendant filed six assignments of error in the district court. However, three assignments of error were not briefed or argued. Consequently, they are considered abandoned. State v. Dominque, 298 So.2d 723 (La.1974).
The following assignments of error were briefed and are relied upon by the defendant: (1) The trial court erred in allowing Sarah Jackson to testify about the facts and circumstances surrounding the defendant's prior conviction for simple battery; (2) the trial court erred in denying the defendant's motion for post-verdict judgment of acquittal, asserting the lack of evidence upon which to base a conviction beyond a reasonable doubt; and (3) the trial court erred in sentencing the defendant, a first felony offender, to ten years at hard labor for sexual battery.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues that the trial court erred in allowing the state to present rebuttal witness Sarah Jackson, who testified as to the true circumstances surrounding the defendant's 1983 conviction for simple battery. The defendant contends that the prior crime was used to demonstrate the defendant's modus operandi. Thus, he claims he *761 was entitled to notice of the state's intent to offer evidence of other crimes. See LSA-C.Cr.P. Art. 720; LSA-R.S. 15:445 and 15:446. The state contends that it offered Ms. Jackson's testimony to impeach the defendant's self-serving testimony.
The defendant testified in his defense. On direct examination, the defendant admitted that he had been convicted of simple battery. He also testified as follows, in response to his counsel's question:
QUESTION: Have you ever forced any woman to do anything against their will? [sic]
ANSWER: No, I haven't.
. . . .
QUESTION: And you tell the Court you have never been convicted or involved in any type of crime like this in your life, have you?
ANSWER: No.
On cross examination, the defendant initially denied that his simple battery conviction involved an attack on a fourteen-year-old girl. He later admitted the battery was on the Jackson girl. The district attorney asked the defendant:
QUESTION: Did you not grab her on the street, threaten her with a knife if she didn't give you some sex?
ANSWER: No.
On rebuttal, following the close of the defendant's case, the state called Sarah Jackson, the then seventeen-year-old victim of the simple battery, to testify as to the true nature of the offense. Defense counsel's objection to this testimony was overruled.
Sarah Jackson testified that she was walking down the street in broad daylight with a young companion. The defendant approached her from behind and grabbed her around the neck. He threatened Sarah's eleven-year-old companion, saying he would "blow his head off" if he didn't leave. The defendant then pulled the girl along the street and told her "you and I are going in the bushes, you are going to give me some...." When the defendant saw a man approaching them on the street, he briefly released the girl, but threatened to blow her head off if she said anything to the man. After the man had passed, the defendant grabbed the girl again. However, she was able to escape from him before being harmed.
In his closing argument, the prosecutor stated that Sarah Jackson's testimony was presented to demonstrate the defendant's dishonesty under oath and to thus impeach his credibility and his testimony. The district attorney also briefly referred to the similarities between the two crimesgrabbing the victim from behind, threatening her, getting the victim past other individuals who might have given her assistance. Defense counsel made no objection to these comments during the prosecutor's closing argument.
Rebuttal evidence is that which is offered to explain, repel, counteract or disprove evidence presented by the adverse party. LSA-R.S. 15:282.
The state may prove on rebuttal that the testimony given by the defendant is untrue. The state has the right to rebut testimony elicited from the accused when he testifies as a witness in his own behalf. State v. Brooks, 294 So.2d 503 (La.1974). A witness may be impeached by evidence of his conviction of a crime. LSA-R.S. 15:495. A cross-examiner is also allowed to elicit details of the crime in order to show the true nature of the offense. State v. Jackson, 307 So.2d 604 (La.1975); State v. Connor, 403 So.2d 678 (La.1981); State v. Truitt, 500 So.2d 355 (La.1987). The district attorney is not required to inform the defendant of the state's intent to offer evidence of convictions to impeach the defendant's testimony. LSA-C.Cr.P. Art. 720.
A situation factually similar to the present case arose in State v. Kelly, 456 So.2d 642 (La.App. 2d Cir.1984), writ denied, 461 So.2d 312 (La.1984). In Kelly, case, the paternal grandfather of a six-year-old girl was charged with aggravated crimes against nature. The defendant took the stand and asserted that he had never sexually molested anyone. On rebuttal, the prosecution presented the testimony of the defendant's two male foster children.
*762 They testified that while they lived with the defendant, he forced them to perform various sexual acts similar to those described by the granddaughter-victim. This court found that the defendant, by his voluntary, self-serving assertion that he had never sexually molested anyone, "opened the door" to the issue of his prior sexual history. Because the defendant placed other prior acts of sexual misconduct at issue, the testimony of his former foster children was relevant to disprove the defendant's assertion. The court found that the probative value of the evidence outweighed its prejudicial effect.
In the present case, the defendant positively testified that he had never forced a woman to do anything against her will and that he had never been convicted or involved in any type of crime like this before (emphasis supplied). By these self-serving assertions, the defendant "opened the door" to the issue of his prior conduct.
The prosecution was entitled to question the defendant to determine the true nature of the previous simple battery conviction. Because the defendant denied the sexual nature of the previous attack, the testimony of Sarah Jackson became a necessary and justifiable tool of impeachment against him. The probative value of her testimony outweighed whatever prejudicial effect it may have had.
Inasmuch as the defendant's prior conviction was used for impeachment purposes, notice of the state's intent to use it was not required. State v. Goza, 408 So.2d 1349 (La.1982).
This assignment of error is meritless.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant contends that the trial court erred in denying his motion for post-verdict judgment of acquittal. He argues that the state failed to prove that the offender "compelled the other person to submit by placing the person in fear of receiving bodily harm." LSA-R.S. 14:43.1. He also contends that the conflicts in the testimony, even when resolved favorably to the prosecution, did not support a finding of guilt beyond a reasonable doubt.
In reviewing the sufficiency of evidence to support a conviction, an appellate court in Louisiana is controlled by the standards pronounced by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Louisiana legislature adopted these standards when it enacted LSA-C.Cr.P. Art. 821 which pertains to post-verdict motions for acquittal based on insufficiency of evidence. The standard enunciated in Art. 821 is that the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. Thomas, 460 So.2d 1069 (La.App. 2d Cir.1984), writ denied 464 So.2d 1374 (La. 1985).
Under LSA-R.S. 14:43.1, sexual battery is defined as follows:
Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender compels the other person to submit by placing the person in fear of receiving bodily harm...:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.
Sexual battery is a responsive verdict to a charge of aggravated rape. LSA-C.Cr.P. Art. 814.
The defendant points to several minor discrepancies in the victim's testimony. She initially complained that the defendant had a gun (which she had not seen), rather than stating the defendant had a knife (which she had seen). However, a review of the victim's testimony demonstrates that the defendant's threats repeatedly emphasized that he would shoot her if she attempted *763 to escape. The victim stated that she felt that she couldn't "outrun a bullet" and thus made no attempt to seek assistance until she reached the relative safety of Gilmore's Lounge.
The defendant also stresses the victim's failure to mention the rape until she was questioned at the police station. In view of the victim's highly emotional state, which was verified by several witnesses, we do not find unusual her initial inability to fully communicate with the police officers. The defendant further asserts that there was a contradiction between the testimony of the victim and the technician from the crime lab as to whether the victim's blue jeans were cut. Contrary to the defendant's assertion, the victim did not testify that the defendant cut the jeans. She stated that he started to cut them when she was disrobing, but he did not actually do so.
The defendant also contends that contradictory testimony was presented as to when the cut on the victim's side was discovered. Regardless of whether the cut was displayed to the officers by the victim at the police station or discovered later at the hospital, as the victim stated, the fact remains that the cut was present. Its presence alone corroborated the victim's testimony.
The jury obviously believed the victim's version of the events rather than that of the defendant. Through Sarah Jackson's testimony, the state impeached the defendant's credibility by showing that he was untruthful in his assertions concerning his prior conviction.
Further, the testimony of two of the defendant's witnesses was discredited. Raymond Washington, a friend of the defendant, and his girlfriend, Betty Martin, testified that they encountered the defendant and the victim in Dodson's Park, and that the victim did not seek their assistance. Mr. Washington admitted that he lied to the police, giving them a false name and address. Ms. Martin conceded that, even though she read about the incident in the newspaper the following day, she never came forth and notified the police that she had information concerning this case.
The victim's distraught and near hysterical state was substantiated by several witnesses. Sam Jones and Frankie Gilmore testified that the victim was trembling and began to cry almost immediately after her arrival at Gilmore's Lounge. Three police officers also verified her obvious distress. Nurse Nuckolls testified that the victim had periods of uncontrollable crying and would not allow the nurse to come in contact with her for ten or fifteen minutes.
The police located the vacant house on Charlene Street behind which the victim said she was raped and found the victim's underclothing. It seems highly unlikely that the victim would have left her undergarments there if the encounter had been voluntary, as the defendant claimed. Also, the victim was able to accurately describe the defendant's unusual knife to Sergeant Laing, even though the defendant claimed that he did not take the knife out of his jacket pocket that evening until he gave it to Officer Barnes. Sergeant Laing testified that the victim was not in a position to observe the knife when Officer Barnes turned it over to him.
When there is conflicting testimony in factual matters, the issue of credibility of witnesses is within the sound discretion of the trier of fact and should not be disturbed on review unless clearly contrary to the evidence. State v. Hoyt, 464 So.2d 841 (La.App. 5th Cir.1985).
The defendant admitted having sexual intercourse with the victim, although he claimed it was with her consent and at her instigation. The victim denied giving her consent. The jury obviously chose to believe the victim. After reviewing all the evidence, we cannot say that a rational jury could not have found the defendant guilty of sexual battery beyond a reasonable doubt. Consequently, we find this assignment of error to be without merit.

ASSIGNMENT OF ERROR NO. 3
The defendant asserts that the trial court erred in imposing a sentence of ten years at hard labor, the maximum penalty for the offense of sexual battery. He contends *764 that the trial court failed to give appropriate consideration to his status as a first felony offender, and that the trial court was influenced by the jury foreman's request that the defendant be given the maximum sentence.[1]
In determining whether a sentence is excessive, the test imposed by the reviewing court is two-pronged. First, the record must show that the trial court took cognizance of factors set forth in LSA-C. Cr.P. Art. 894.1 which enumerates criteria to consider in determining whether a sentence is excessive. State v. Hammonds, 434 So.2d 452 (La.App. 2d Cir.1983), writ denied 439 So.2d 1074 (La.1983). While the trial court need not articulate every aggravating and mitigating circumstance outlined in LSA-C.Cr.P. Art. 894.1, the record must reflect that the court adequately considered those guidelines in particularizing the sentence to the defendant. State v. Smith, 433 So.2d 688 (La.1983).
Second, the reviewing court must then determine whether the sentence imposed is too severe given the circumstances of the case and the background of the defendant. A sentence is unconstitutionally excessive in violation of LSA-Const.1974, Art. 1, § 20 if the sentence is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied 435 So.2d 433 (La.1983).
In selecting the proper sentence, a trial judge is not limited to considering only a defendant's prior convictions, but may properly review all prior criminal activity. State v. Palmer, 448 So.2d 765 (La.App.2d Cir.1984), writ denied 452 So.2d 695 (La.1984). As a general rule, the maximum or near maximum sentences are to be reserved for the worst offenders and the worst offenses. State v. Lathers, 444 So. 2d 96 (La.1983); State v. Williams, 454 So.2d 1287 (La.App.2d Cir.1984). A trial court is not required to render a suspended sentence or probation on a first felony offense, but may consider whatever factors and evidence it deems important to a determination of the best interest of the public and the defendant. State v. McKethan, 459 So.2d 72 (La.App.2d Cir.1984).
The trial court considered the prior record of the twenty-eight-year-old defendant. In 1979, he was charged with simple battery, but the charge was nol prossed. In 1983, he was charged with aggravated assault and simple battery as a result of his attack on fourteen-year-old Sarah Jackson. The aggravated assault charge was nol prossed, and the defendant was convicted of simple battery. In the present offense, the court noted that the defendant was originally charged with aggravated rape, aggravated oral sexual battery, and simple kidnapping.
The presentence investigation report revealed that the defendant was unmarried and had no dependents. While in school, he had a history of suspensions for fighting. He completed the ninth grade at the age of fifteen, and then dropped out. He later obtained a Graduate Equivalence Diploma (G.E.D.) while in the Job Corps in Oklahoma. While he maintained employment after quitting high school, his employment has not been consistent.
The trial court found that the defendant's criminal conduct threatened serious harm to the victim. In fact, as a result of the defendant's conduct, the victim suffered great emotional trauma. (She testified at trial that she was hospitalized for a nervous breakdown four days after the attack.) The trial court found that the defendant's conduct was likely to reoccur, and that he was in need of correctional treatment in a custodial environment. The *765 trial court stated that the defendant's conduct was among the most serious possible violations of the sexual battery statute. Consequently, the defendant was sentenced to the maximum term of ten years at hard labor.
The trial court did not err in the imposition of this sentence. The facts justify the trial court's statement that the defendant's conduct constituted one of the worst offenses possible under the statute. Thus, the imposition of a maximum sentence was justified. We also agree that based upon the defendant's prior record, his criminal conduct was likely to occur again.
There is no basis to believe that the trial court was influenced by the jury foreman's post-verdict query as to whether the jury could request imposition of the maximum sentence for sexual battery. The trial court informed the foreman that it was not an appropriate request. The record demonstrates that the trial court properly considered the factors enumerated in LSA-C.Cr.P. Art. 894.1 in determining the defendant's sentence. The maximum sentence was imposed because it was merited by the defendant's conduct.
This assignment of error is without merit.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Immediately after the rendition of the jury verdict, the following exchange occurred between the jury foreman and the trial judge:

FOREPERSON: Is this appropriate if we wanted you to give him the maximum sentence
THE COURT: No sir.
FOREPERSON: We can't say that?
THE COURT: No sir.